**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
DAVID BERRIOS and IGNACIO CHAVEZ,
on behalf of themselves, and others similarly situated,

                           Plaintiffs,

              - against -

 

NICHOLAS ZITO RACING STABLE, INC. and
NICHOLAS ZITO, in his individual capacity

                          Defendants.
--------------------------------------------------------------X

                                      **MEMORANDUM**
                                      **AND ORDER**

                                        CV 04-22 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.**       **PRELIMINARY STATEMENT**

      David Berrios ("Berrios") and Ignacio Chavez ("Chavez") bring this action on behalf of

themselves, and others similarly situated (collectively, the "Plaintiffs"), against Nicholas Zito

Racing Stable, Inc. ("Zito Racing") and its principal, Nicholas Zito ("Zito") (collectively, the

"Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201,

*et seq.*, and the New York Labor Law ("NYLL"), N.Y. Lab. L. § 190, *et seq.* Specifically,

Plaintiffs allege that Defendants failed to pay them, and other workers similarly situated,

appropriate overtime compensation. Plaintiffs also allege that Defendants failed to pay "spread

of hours" wages under New York law.

      Presently before the Court are the parties' cross-motions for partial summary judgment.[1]

For the reasons stated below, Plaintiffs' motion is GRANTED, in part, and Defendants' motion

is DENIED, with the exception of dismissing those claims brought on behalf of exercise riders.

---

1      The parties have consented to my jurisdiction for all purposes pursuant to 28 U.S.C.
§ 636. *See* DE 185.

## II.   BACKGROUND

### A.   Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Rule 56.1 statements of facts.  Unless otherwise noted, the following facts are not in dispute.

Defendants are in the business of training thoroughbred racehorses.  Zito Racing is a corporation, with an office located at Belmont Race Track.  Nick Zito serves as head trainer and is the sole shareholder and president of Zito Racing.  The horses trained by Defendants race year-round at such New York race tracks as Aqueduct, Belmont and Saratoga.  In addition to racing at Belmont and Saratoga, Zito Racing maintains barns at these locations.  At each barn, an assistant trainer serves as the direct supervisor for the employees located there.  Employees are hired as either grooms, hot walkers, foremen, watchmen or exercise riders, with each position carrying a distinct set of responsibilities.

Plaintiffs Berrios, Chavez, Eleazar Hernandez and Luis Hernandez were employed by Zito Racing as grooms.[2]  Generally speaking, grooms are responsible for getting the horses ready for the day's training sessions.  This job includes rubbing the horse with liniment, brushing the horse, removing leg wraps and cleaning the stalls.  After the training session is over, grooms also clean off the horse, apply leg bandages and prepare the stalls for the horses.  Grooms work in pairs and are usually assigned to take care of three horses.  According to the Plaintiffs, grooms work seven days a week, typically working anywhere from 4:00-5:00 a.m. until 11:00-11:30 a.m. and from 3:00 p.m. to 4:30 p.m. again every other afternoon.  Defendants, however, claim that

---

[2]    Luis Hernandez was initially hired as a hot walker, but spent the majority of his employment as a groom.

grooms have regular hours from 5:00 a.m. to 11:00 a.m. each day and are required to return to work every other afternoon from 3:00 p.m. to 4:30 p.m.  In addition, grooms are required to accompany the horses they care for to Aqueduct when those horses are scheduled to race.  Prior to 2003, grooms were paid a weekly salary of $375, but that amount was subsequently increased to $400.

Plaintiffs Ernestine Gooden and Adrianna Ceragioli were employed as hot walkers.  The main responsibility of a hot walker is to slowly walk horses after they have run, either in training or at a race.  According to the Plaintiffs, hot walkers worked seven days a week, typically working anywhere from 5:00-5:30 a.m. to 11:00-11:15 a.m. and every afternoon for at least one hour.  Defendants maintain that hot walkers, at most, work from 5:30 a.m. to 10:00 a.m. every morning and have the option of returning in the afternoon for one additional hour.  Hot walkers are also required to accompany horses to Aqueduct Racetrack.  Depending on the year, hot walkers have been paid a weekly salary between $185 and $210.

### B.    Procedural History

The initial Complaint was filed by then Plaintiff Domingo Gonzalez on January 6, 2004.  On July 23, 2004, Magistrate Judge Orenstein certified this action as a collective action pursuant to the FLSA.[3]  *See* DE 12.  Initially, twelve individuals filed consent to joinder forms.  *See* DE 5-6, 20-23, 30, 33-34, 41-43.  However, only six individuals remain in this action.[4]  The

---

3        The case was re-assigned to the undersigned on March 30, 2006.

4        On May 5, 2005, a stipulation of discontinuance was filed on behalf of four opt-in Plaintiffs who voluntarily withdrew their notices of consent to joinder.  *See* DE 49.  As discussed below, named Plaintiff Domingo Gonzalez was also dropped from the action upon the filing of the Third Amended Complaint.  In addition, Judge Townes indicated in her March 31, 2008 Memorandum and Order that two other opt-in Plaintiffs were no longer part of this action.  These two individuals were Shannon Geiser and Elvin Davis.  While this Court was unable to locate their formal withdrawal from this action on the court docket, the record does not reflect any objection by the Plaintiffs as to the number of opt-in Plaintiffs remaining in the action.  As

remaining opt-in Plaintiffs are: (1) Eleazar Hernandez; (2) Luis Hernandez; (3) Ernestine Gooden; (4); Adrianna Ceragioli; (5) David Berrios; and (6) Ignacio Chavez.  On March 31, 2008, Judge Townes granted then Plaintiff Gonzalez's request to certify this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, for a class consisting of:

> The plaintiffs and all individuals including past or present employees of Nicholas Zito Racing Stables who worked as watchmen, grooms, hot walkers, and in other occupations related to the horse racing industry within the state of New York from 1999 through the present.[5]

*See* DE 86.  Judge Townes also allowed for the amendment of the Complaint to change the class representative from Domingo Gonzalez to David Berrios and Ignacio Chavez, and to seek recovery of unpaid wages pursuant to New York's "spread of hours" statute.  *See* DE 86.  The Amended Complaint was filed on September 11, 2008, dropping Gonzalez from the case and adding Berrios and Chavez as named Plaintiffs.  *See* DE 97.  The Amended Complaint was thereafter amended two additional times, with the final operative pleading, the Third Amended Complaint, being filed on December 10, 2010.  *See* DE 124.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure dictates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.

---

such, the Court moves forward with the understanding that six Plaintiffs remain pursuant to the FLSA claim.

[5]      For purposes of this motion, and going forward in this litigation, the Court will treat each category of employee (*i.e.*, groom, hot walker) as sub-classes.

*See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party.  *Doro v. Sheet Metal Workers' Int'l Ass'n,* 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."  *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor.").  Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *1 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).  However, if "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary

5

judgment is improper." *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir. 1997) (citing *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997)).

## IV.   DISCUSSION

At the outset, the Court is compelled to address an evidentiary issue raised in the parties' motion papers.  Specifically, Plaintiffs take issue with the declarations submitted by assistant trainers Timothy Poole ("Poole") and Ricardo Troncozo ("Troncozo").  Plaintiffs assert that these declarations, which were submitted with Defendants' summary judgment papers, contradict critical prior testimony and should therefore be disregarded.  The rule in the Second Circuit is well-settled that "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991).  The fact that the affiant at issue is not a party to the action will not permit him from defeating a motion for summary judgment by contradicting his deposition testimony.  *See Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); *see also Martin v. City of N.Y.*, 627 F. Supp. 892, 896 (E.D.N.Y. 1985).  The Court notes that while Troncozo was previously deposed, Poole was not.  Therefore, to the extent Troncozo's declaration contradicts his previous deposition testimony, it will be disregarded.  However, since Poole was never deposed, his declaration cannot contradict any prior testimony of his and will therefore be considered by the Court.  Having decided this evidentiary issue, the Court will now turn to the merits of the parties' respective summary judgment motions.

6

A.       **Plaintiffs' Motion for Summary Judgment**

Plaintiffs argue that grooms and hot walkers employed by the Defendants irrefutably worked in excess of 40 hours per week, without proper overtime compensation.  Defendants counter that there are genuine issues of fact with respect to both the hours of work by grooms and the compensation paid to them.  With regard to hot walkers and exercise riders, Defendants cross-move for summary judgment on the grounds that these sub-classes do not work over 40 hours per week as a matter of law.[6]  Aside from claiming that Plaintiffs do not work over 40 hours per week, Defendants also argue that Plaintiffs received a fixed compensation for a fixed schedule, which Defendants assert does not violate federal or state labor laws.  Defendants also maintain that any overtime worked by Plaintiffs was in violation of its policies and practices and therefore did not violate the FLSA.  Finally, Defendants contend that Plaintiffs are not entitled to summary judgment as to their spread of hours claim, and, instead, argue that this claim should be dismissed.

Section 207 of the FLSA mandates that employers must compensate their respective employees for hours in excess of 40 per week at a "rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  The same holds true under New York law.  *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; *see also Chun Jie Yin v. Kim*, No. 07-CV-1236, 2008 WL 906736, at *4 (E.D.N.Y. Apr. 1, 2008) ("Like the FLSA, however, New York mandates that employers provide time-and-a-half compensation for their employees' work hours that exceed 40 hours per week.").  It is of no consequence under the FLSA that an employer compensates its employees annually or weekly.  *See* 29 C.F.R. § 778.109 ("The Act does not require employers to compensate employees on an hourly rate basis.").  An employee

---

6       The Court will address this portion of Defendants' motion for summary judgment in the section dedicated to Plaintiffs' motion.

7

who sues for overtime compensation bears the burden of proving that an employer did not properly compensate him. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946).

However, the FLSA requires employers to maintain accurate records of the hours and wages of their employees. *See* 29 U.S.C. § 211(c) (requiring every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him"); *see also* 29 C.F.R. § 516.2(a)(7) (requiring that employers maintain records of "[h]ours worked each workday and total hours worked each workweek" by employees). New York State maintains similar record keeping requirements for employers. *See* N.Y. Lab. Law § 661 (requiring employers to establish and maintain payroll records "showing for each week worked the hours worked, the rate or rates of pay and basis thereof"); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.6(a)(4) (requiring employers to establish, maintain and preserve, for not less than six years, weekly payroll records which show for each employee "the number of hours worked daily and weekly, including the time of arrival and departure for each employee working a split shift or spread of hours exceeding 10").

In situations where an employer's payroll records are inaccurate or inadequate, "an employee has carried out his burden if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687; *see also Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997) (concluding that when a defendant fails to maintain the required employment records, the employee may "submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred") (internal quotation marks omitted). "As courts have found, a plaintiff can

8

meet this burden 'by relying on recollection alone.'" *Santillan v. Henao*, --- F. Supp. 2d ----, 2011 WL 4628752, at *16 (E.D.N.Y. Sept. 30, 2011) (quoting *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005)) (collecting cases). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88; *see also Ramirez v, Rifkin*, 568 F. Supp. 2d 262, 273 (E.D.N.Y. 2008) (stating that after plaintiff meets his initial burden, "[t]he burden then shifts to the employer to show that the inference is not reasonable."). A similar standard to *Anderson* is applied in deciding overtime claims under New York law. *See Park v. Seoul Broad. Sys. Co.*, No. 05-CV-8956, 2008 WL 619034, *8 n.13 (S.D.N.Y. Mar. 6, 2008). However, the New York standard places a more demanding burden on employers than the FLSA. *See Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 307 (E.D.N.Y. 2009) (concluding that after plaintiff meets its burden, "[t]he burden then shifts to the employer to prove by a preponderance of the evidence that the plaintiff was properly paid for the hours worked"); *see also Jiao v. Shi Ya Chen*, No. 03 Civ. 165, 2007 WL 4944767, at *3 (S.D.N.Y. 2007) (finding that if an employer is unable to meet its burden under the FLSA, it could not satisfy the burden under New York law).

In this case, the submitted payroll records show that Defendants did not keep track of the hours worked by the Plaintiffs. *See* Pls.' 56.1 Stmt, Exs. J-P. While Defendants continue to emphasize the fact that their payroll practices were customary, if not uniform, in the industry, such uniformity in the industry does not make the payroll practices of the Defendants legal. James Hilt, who served as Defendants' bookkeeper, testified that Zito Racing did not have a system in place for monitoring the hours worked by its employees. *See* Hilt Dep. at 114:13-16. Assistant trainers Troncozo and Poole also confirmed the lack of such records. Troncozo, who

9

was the supervisor in charge of those Zito Racing employees located at Belmont Racetrack, testified that he did not keep any record of when grooms and hot walkers arrived and left in the morning and when they came back for the afternoon shift. *See* Troncozo Dep. at 93:17-94:4. The only sort of record keeping identified by Troncozo was a reference to his foreman keeping track, on a piece of paper which was thrown out each week, how many days each employee showed up for work and which of these employees returned for the afternoon shift. *Id.* at 95:10-20, 98:10-99:10,101:25-102:17, 136:19-23. Assistant trainer Poole also admitted that "Zito Racing does not keep strict track of the hours worked by these grooms" and that Zito Racing "took a relaxed approach to keeping track of hours actually worked by our grooms." Poole Decl. ¶¶ 9, 12. The Defendants' payroll records merely indicate the employee's name and the amount paid to that individual each week.[7] It was not until September 2008 – after the employment of the Plaintiffs and opt-in Plaintiffs ended – that Zito Racing began to keep track of, and record, the hours worked by it employees. *See* Pls.' 56.1 Stmt, Ex. Q.

The failure by Zito Racing to keep records for the hours worked by its employees prior to September 2008 warrants the application of the lesser burden of proof for those time periods where such records are not available. *See Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 31 (2d Cir. 2002) ("When accurate records or precise evidence of the hours worked do not exist, an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.") (quoting *Anderson*, 328 U.S. at

---

[7]     The payroll records also contain a column labeled "OT," with figures ranging from $0 to $130. The parties, however, do not dispute that these figures do not correlate to the hours worked by the employees. Instead, the record indicates that Zito Racing paid additional flat sums to its employees for completing additional tasks and for the times when the horses cared for by a particular employee won races.

10

687); *Rivera v. Ndola Pharm. Corp.*, 497 F. Supp. 2d 381, 389 (E.D.N.Y. 2007) (applying lesser

standard where the time sheets contained only the employee's name and amount paid that week).

### 1.   Hours Worked

It is the Plaintiffs' contention that both grooms and hot walkers have worked over 40

hours a week without being properly compensated.   Each category of employee will be

addressed separately.

#### a.   Grooms

Due to the lack of adequate records maintained by Defendants prior to September 2008,

Plaintiffs need only submit sufficient evidence to show the amount and extent of the hours

worked as a matter of just and reasonable inference.  *Anderson*, 328 U.S. at 687.  A plaintiff may

meet this burden by relying solely on his own recollection.  *See Rivera*, 497 F. Supp. 2d at 388

(citing *Doo Nam Yang*, 427 F. Supp. 2d at 335).  In this instance, the Court finds that Plaintiffs

have met their burden.[8]

Plaintiff Berrios, who was employed as a groom for Zito Racing, testified at his deposition

that he would start working at 4:00 a.m. and would typically finish his work at 11:00 a.m, seven

days a week.  *See* Berrios Dep. at 9:5-10:22.  Berrios stated that on occasion he would have to

take care of an extra horse, which would result in his working as late as noon.  *Id.* at 38:21-39:5.

Berrios also testified that he would have to come back in the afternoon every other day.  *Id.* at

10:15-17.  Moreover, on days in which the horses Berrios cared for were racing at Aqueduct, he

was required to accompany them to the track, which resulted in his working from approximately

11:00 a.m. to 5:00-6:00 p.m. in the afternoon.  *Id.* at 12:6-12.  According to Berrios, this

---

8        Defendants argue that none of the Plaintiffs kept any records of their hours.  This
argument however, reverses the burden of proof.  It is the employer's responsibility to keep
records of the hours worked by its employees, not vice-versa.

occurred six to seven times a month for the months that Aqueduct Racetrack was open. *Id.* at 56:21-57:7.

Plaintiff Chavez also testified during his deposition that as a groom, he started work at 4:00 a.m. and ended around 11:00 a.m., seven days a week. Chavez Dep. at 10:15-18, 26:20-27:15. If he had to take care of an extra horse, Chavez testified to working as late as noon during the morning session. *Id.* at 11:15-12:6. Chavez further stated that every other day he was required to come back to the stables to work from 3:00 p.m. until 4:30 p.m. *Id.* at 27:14-28:2. Additionally, he accompanied his horses to Aqueduct, which resulted in his working an additional five or more hours. *Id.* at 52:17-53:5. According to Chavez, this occurred two to four times a month. *Id.* at 53:6-14. A similar schedule was confirmed by other grooms employed by Zito Racing. *See* L. Hernandez Dep. at 17:4-9, 26:7-27:17 (testifying that as a groom, he worked from 4:00 a.m. to 11:00 a.m. seven days a week and returned to work in the afternoon every other day); E. Hernandez Dep. at 24:12-16, 28:14-30:24, 36:22-37:21 (testifying that as a groom, he worked from 4:00 a.m. to 11:00 a.m. seven days a week and returned to work in the afternoon three or four days a week from 3:00 p.m. to 4:30 p.m.). Based on this evidence, the Court finds "as a matter of just and reasonable inference" that the hours worked by grooms exceeded 40 hours per week.

The burden then shifts to the Defendants to come forward with evidence of either the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employees' evidence. Defendants fail to do either. The Court initially notes that Defendants' counsel readily admits that "[i]n the case of grooms, the workweek customarily exceeds 40 hours. Grooms work from 5:00 a.m. to 11:00 a.m., and every other afternoon for 1.5 hours, for a workweek that alternates between 46.5 hours and 48 hours."

12

Defs.' Mem. of Law in Opp. to Plfs.' Mot. for Summ. J. at 8.  While the timesheets Defendants

started to utilize in September 2008 do not mention the sub-class of each listed employee, certain

employees' schedules match up with this weekly schedule of over 40 hours.[9]  *See* Pls.' 56.1

Stmt, Ex. Q.  Even putting aside this statement by counsel, the testimony of the Defendants do

not negate the reasonableness of the inference that grooms work over 40 hours per week.

Assistant trainer Troncozo testified that when he was first hired by Defendants as a groom

himself, he worked seven days a week, arriving sometime between 4:30-5:00 a.m., staying until

10:00-10:30 a.m., and then returning to work in the afternoon for an hour and a half every other

day.  *See* Troncozo Dep. at 30:19-31:2, 36:11-38:3, 64:14-68:19.  Troncozo confirmed that

grooms under his supervision worked essentially the same hours he did while employed as a

groom, reporting to work every day around 4:30-5:00 a.m. and working until 10:00-10:30 a.m.[10]

*Id.* at 89:20-23, 117:19-119:6, 122:20-123:6.  Even applying the shortest possible workweek

---

[9]     For example, the timesheets for the pay week ending September 19, 2008 show
numerous employees working 5:00-11:00 a.m. and 3:00-4:40 p.m.  The same holds true for all
subsequent timesheets in 2008.  The timesheets from 2009 contain identical morning hours but
reflect that grooms in the afternoon worked from 3:00-4:30 p.m. daily.  *See* Pls.' 56.1 Stmt, Ex.
Q.

[10]     A brief discussion is warranted as to Plaintiff Berrios, who admittedly held other jobs
while also working for Zito Racing.  Berrios testified that while he never missed work at Zito
Racing for other jobs, he would work for the New York Racing Association parking cars from
11:30 a.m. to 5:00 p.m. on days when races were held at Belmont.  *See* Berrios Dep. at 16-17.
Berrios also testified that when races occurred at Aqueduct, he would work there as well,
parking cars and assisting in the kitchen.  *Id.* at 55-58.  While Trancozo testified that Berrios
"almost never" worked the afternoon session at Zito Racing, this alone does not negate the
inference in favor of Berrios' testimony that he worked over 40 hours.  Berrios testified that he
worked 7 hours each day during the morning session.  *Id.* at 9:3-10:22.  This fact itself yields a
workweek in excess of 40 hours.  Moreover, Troncozo testified to a range of hours for grooms
which also resulted in a workweek of over 40 hours – even if Berrios only worked the morning
session each day.

13

testified to by Tronocozo,[11] grooms would still, at the very least, have worked over 40 hours during the weeks in which they worked four afternoon shifts.

Defendant Nick Zito also presented testimony that grooms, who have worked seven days a week, show up for work anywhere between 4:30-5:30 a.m. and typically do not leave until sometime between 10:00-11:00 a.m.  *See* Zito Dep. at 75:17-25, 81:7-16, 84:16-22.  Zito also confirmed that grooms are required to come back every other afternoon and work what he believed to be a shift of 3:30 p.m. to 4:30 p.m.  *Id.* at 105:12-22.  While the shortest workweek testified to by Zito would not exceed 40 hours, his testimony falls short of negating the reasonable inference drawn from Plaintiffs' testimony that they work more than 40 hours a week.  If the Court were to average the range described by Zito for the time grooms arrive and leave in the morning (5:00 a.m. to 10:30 a.m.), and added in the afternoon shift of one hour every other day as Zito claims, the workweek would still exceed 40 hours.  *See Padilla*, 643 F. Supp. 2d at 308 (averaging hours where a range of hours was provided for each shift).  Moreover, Zito acknowledged the fact that he did not "know exactly what time" grooms showed up to work since the grooms were already at the barn prior to the time he arrived.  *Id.* at 68:13-20.

Assistant trainer Poole's declaration also fails to negate the inference afforded the Plaintiffs regarding the hours they worked.[12]  Poole states that grooms whose horses begin training at 6:00 a.m. *should* get to the barn between 5:00 -5:30 a.m., and those grooms whose horses are scheduled later *might* arrive later.  Poole Decl. ¶ 8.  Poole claims that all grooms'

---

11      The shortest workweek according to his testimony would be 5:00 a.m. to 10:00 a.m., seven days a week, and 3:00 p.m. to 4:30 p.m., every other day.

12      As noted previously, since the portion of Troncozo's declaration addressing the hours worked by grooms is inconsistent with his prior deposition testimony, the Court will not consider this evidence.

work is done around 10:00 a.m. and that grooms return to work for an hour and a half every other afternoon.  Poole Decl. ¶ 9.  Yet, Poole acknowledges "Zito Racing does not keep strict track of the hours worked by these grooms in the afternoons . . . ."  *Id*.  Even accepting this range of hours, grooms are capable of exceeding 40 hours on a weekly basis.  Furthermore, Poole's attempt to "chip away" at the total hours grooms work by stating that grooms *might* arrive later or leave earlier depending on when their assigned horses go out for training is ineffective.

The Court finds a portion of Poole's Declaration to be revelatory on this point:

> Because the work grooms do is dictated by the hours of training and the care of the horses, Zito Racing like most other trainers historically took a relaxed approach to keeping track of hours actually worked by our grooms. This was for the grooms' benefit, as they often switched off with each other to cover assigned horses.  In fact, several years ago we asked our grooms and hot walkers whether they would want to have employee punchclocks installed in the barns, and they responded overwhelmingly against the idea.  As is the custom and practice in the thoroughbred racing industry, grooms are paid for their work, not for their hours.

Poole Decl. ¶ 12.  Posing the question of tracking hours worked to the grooms and hot walkers through use of a punchclock installation, which the employees purportedly rejected, reflects the very relaxed approach of management to its obligations under both the federal and state wage laws.  Poole does not provide a single example, from his own personal observations, of the actual hours he saw Plaintiffs – or any groom for that matter – coming to or leaving from work. Such generalizations lacks the specificity necessary to negate the inference Plaintiffs retain due to Defendants' lack of adequate record-keeping.  As such, the Court concludes that the grooms employed by Zito Racing worked over 40 hours a week.

### b.    *Hot Walkers*

Admittedly, the question of whether hot walkers work over 40 hours each week is less clear.  The testimony of the Plaintiff hot walkers, at the least, meets their initial burden of showing that the amount and extent of the time worked exceeded 40 hours per week as a matter of just and reasonable inference.  Luis Hernandez, who was employed by Defendants first as a hot walker, testified that he arrived between 5:00-5:30 a.m. each morning and did not stop working until 11:00-11:15 a.m.  L. Hernandez Dep. at 11:8-12.  Luis Hernandez also stated that he came back in the afternoon every day for an hour.  *Id.* at 11:19-21, 15:20-25.  According to Luis Hernandez, he worked as late as noon at times, and spent even more time working when he had races over at Aqueduct.  *Id.* at 15:12-17.  Fellow hot walker Adriana Cergioli testified that she worked a daily schedule where she would arrive at 5:00 a.m. and work until 11:00 a.m. and then return every afternoon from 3:00 to 4:30 p.m.  Cergioli Dep. at 11:14-17, 20:12-20.  Moreover, Cergioli stated that she would have to accompany horses racing at Aqueduct five times a week for at least five hours.  *Id.* at 22:2-12.  Lastly, Ernestine Gooden testified that she worked from 5:00 a.m. to 10:30-11:00 a.m. and returned to work in the afternoon five to six days a week, starting at 3:00 p.m.  Gooden stated that she sometimes stayed as late as 6:00 p.m.  Gooden Dep. at 16:5-13, 19:2-5, 23:24-25.

Unlike the specific circumstances of the grooms, the Court concludes that Defendants have come forward with evidence to negate the reasonableness of the inference to be drawn from the Plaintiffs' evidence that hot walkers have worked over 40 hours a week.[13]  Troncozo testified

---

[13]    Such evidence, however, does not include the fact that Plaintiffs Luis Hernandez and Eleazar Hernandez were fired for alleged drunkenness and excessive absences from work.  Aside from not being relevant to the issue of the hours worked, a witness' credibility is not a factor for the Court to consider on summary judgment.  *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

that hot walkers start work sometime between 5:30-6:00 a.m. and work until 10:00 a.m. and have the option of coming back in the afternoon for one hour.[14]  Troncozo Dep. at 118:19-119:6; Troncozo Decl. ¶ 7.  Fellow assistant trainer Timothy Poole corroborated Troncozo's testimony regarding the hours hot walkers work for Defendants.  *See* Poole Decl. ¶¶ 15-16 (stating that hot walkers arrive as early as 5:30 a.m. but do not stay past 10:00 a.m., and are allowed to return to work for one hour in the afternoon from 3:00 p.m. to 4:00 p.m.).  This range of hours provides a maximum workweek of 38.5 hours.  Furthermore, the payroll records which Defendants began to keep in September 2008 indicate that certain employees, presumably hot walkers, worked every day from 5:30 a.m. to 10:00 a.m. and again from 3:00 p.m. to 4:00 p.m.  Defendants argue that the hours worked by hot walkers did not change between 2000 and 2008.  While this may be the case, this contention cannot be ascertained from the record.  In light of the conflicting testimony over the hours hot walkers work each week, neither party is entitled to summary judgment on the claims asserted by the hot walkers.

### c.    *Exercise Riders*

According to Defendants, exercise riders, who serve as jockeys during the horses' training sessions, only work from 6:00 a.m. to 10:00 a.m., and therefore, never work more than 40 hours per week.  None of the Plaintiffs were employed by Zito Racing as exercise riders.  In fact, Plaintiffs fail to adduce any evidence regarding the hours worked or the compensation paid to exercise riders.  Without any evidence in the record addressing exercise riders, Plaintiffs fail to meet their initial burden under *Anderson*.  Therefore, even though Defendants failed to maintain

---

14      While Defendants attempt to classify the afternoon hours worked by hot walkers as "voluntary," these hours are still considered a compensable hour for overtime consideration.  *See* 29 C.F.R. § 778.223 (defining "hours worked" to include "all time during which an employee is . . . permitted to work whether or not he is required to do so")*.*

adequate records, Defendants are entitled to summary judgment regarding all claims potentially brought by exercise riders.[15]

### 2.    Employee Compensation

Notwithstanding the total weekly hours worked by Plaintiffs, and specifically Plaintiff grooms, Defendants argue that Plaintiffs were paid a fixed compensation for a fixed schedule based on an agreement between the parties.   Defendants maintain that based on the parties' agreement, the weekly salary for grooms incorporated a premium for hours worked in excess of 40 hours.

"[A]n employer asserting that an employee's weekly salary includes FLSA-required overtime payments must prove not just that the employee regularly works over 40 hours per week, but also that the employer and employee contracted for the weekly salary to include the overtime period."  *Giles v. City of N.Y.*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999).  "There is a rebuttable presumption that an employer's payment of a weekly salary represents compensation for the first 40 hours of an employee's work-week; the burden is on the employer to rebut this presumption with evidence that the employer and employee had an agreement that the employee's weekly compensation would cover a different number of hours."  *Jiao*, No. 03 Civ. 165, 2007 WL 4944767, at *13 (E.D.N.Y. Mar. 30, 2007) (citing *Giles*, 41 F. Supp. 2d at 317). Courts have made clear that "[u]nless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to

---

[15]    Since no exercise riders opted-in to this action, there would be no basis for an FLSA claim in any event.  However, since a class consisting of "past or present employees of Nicholas Zito Racing Stables who worked as watchmen, grooms, hot walkers, and in other occupations related to the horse racing industry" was certified for the state law claims, exercise riders could have fallen under the catch-all "other occupations" language used to describe the certified class. Therefore, in an abundance of caution, the Court dismisses this sub-class from this action.

include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours." *Giles*, 41 F. Supp. 2d at 317 .

The Court initially notes that Defendants' employees did not enter into any sort of written employment contract. While the lack of an employment contract certainly does not help Defendants' argument, it may not be fatal either. A few courts have determined that in situations where there is no written employment agreement or other written instrument memorializing the parties' intentions, the court infers the terms of the parties' agreement from "the entire course of their conduct, based on the testimonial and documentary evidence in the record." *Moon v. Kwon*, 248 F. Supp. 2d 201, 206 (S.D.N.Y. 2002); *see also Jiao*, 2007 WL 4944767, at *13.

Plaintiff Berrios claimed that when he went to Zito Racing's barn looking for a job, he spoke to Tim Poole. Berrios further testified that he did not have any discussion with Poole about what his hours would be as a groom for Zito Racing other than Poole telling him to get there early. *See* Berrios Dep. at 8:16-9:13. According to Louis and Eleazar Hernandez, a similar hiring scenario occurred with Poole where there was no discussion about what the hours of employment or pay would be. *See* L. Hernandez Dep. at 10:14-11:2; E. Hernandez Dep. at 44:6-22. Even James Hilt, Defendants' bookkeeper, testified that no special verbalized employment arrangement existed between the parties. Hilt Dep. at 97:3-13.

Defendant Troncozo, however, testified about his interaction with new hires as follows:

> Q.    Now, you've testified that you're responsible for hiring people, correct?
>
> A.    Yeah, sure. In case we need it.
>
> Q.    An when someone gets hired, what, if anything, do you do when you hire them?
>
> A.    Tell them how much you get to pay a week.

19

> Q.      You were never told how much you were going to
>         get paid?
>
> A.      I don't remember.
>
> Q.      What else did you do?
>
> A.      I t[e]ll them how many days they work, they come
>         in the afternoon to help out with the horses.   He
>         come, no problem, he g[e]t to pay extra.

Troncozo Dep. at 146:24-147:11.  The Court notes that Defendants attempt to support their

argument by relying on the declarations of Troncozo and Poole submitted in conjunction with

the Defendants' summary judgment motion.  In his declaration, Troncozo states that:

> Each groom and hot walker who seeks employment with Zito
> Racing is told by me what the weekly salary will be for the
> position; what the responsibilities are; and what hours he or she is
> expected to work.  Every employee is clear at the time he or she is
> hired as to what his or her hours and responsibilities will be, and
> that the weekly salary for the position is paid for those hours and
> those responsibilities.  If anyone does not agree with the hours,
> responsibilities or salary, they do not take the job.

Troncozo Decl. ¶ 3.  Nowhere in his deposition testimony, when he was questioned at length on

this subject, does Trancozo state he ever told a prospective or new groom or hot walker what

hours he or she was expected to work.  Nor, just because Troncozo *says* so, is there actual

evidence in the record that it was clear to every employee at the time of hire what his or her

hours and responsibilities would be – nor can Troncozo testify to any employee's state of mind

or understanding.  In fact, the Court finds Troncozo's declaration to be somewhat disingenuous

in this regard, particularly in light of his testimony regarding his experience when he was hired

as a groom, at which time he did not discuss with the assistant trainer what he would be getting

paid and just showed up for work the next morning at 4:30 a.m. and worked seven days a week.

Trancozo Dep. at 29:19-30:23, 37:25-38:6.  Therefore, in accordance with the Second Circuit's

holding in *Hayes*, the Court will not consider these portions of Troncozo's declaration as a basis for granting or denying Defendants' motion for summary judgment.

As to Poole, he asserts that since grooms are experienced horsemen, they know the usual and customary hours that grooms work. Poole Decl. ¶ 10. Poole goes on to state that grooms are told at the time they apply "what the weekly salary is, and what their usual hours are, and they agree to both or they do not take the position." *Id.* Again, Poole does not particularize an exchange with any individual and, instead, repeats what the general practice was – generalizations which do not advance the Defendants' case, particularly in the context of a group of employees who speak little, if any, English.

The Court notes that nowhere in the actual record is there any evidence of what the "agreed upon" weekly hours would be.[16] Instead, Defendants submit, in conclusory fashion, that the grooms were told what their usual hours would be, without ever identifying what those hours actually were. Even assuming that this purported "agreement" regarding the weekly salary and hours occurred before a groom was hired, that fact does nothing to establish the existence of some understanding that the weekly salary included overtime hours at a premium rate. *See Giles*, 41 F. Supp. 2d at 317. What is lacking from this purported agreement is any evidence that the Plaintiffs actually understood that their weekly wages included a premium for time and one half for the hours worked over 40. *See Jacobson v. Stop & Shop Supermarket Co.*, No. 02 Civ. 5915, 2003 WL 21136308, at *3 (S.D.N.Y. May 15, 2003) ("If an employer seeks to pay a non-exempt employee a weekly salary that includes a premium overtime component calculated at

---

16      The Court finds Defendants' contention that Poole states in his declaration that grooms work 46.5 to 48-hours each week or that such a specific workweek is customary in the industry (*see* Defs.' Mem. in Opp. at 18) to be inaccurate. Nowhere in Poole's declaration is there any statement about a customary 46.5 to 48-hour workweek for grooms. To the contrary, Poole spends a substantial portion of his declaration attempting to cast doubt on the range of hours grooms worked each week.

time and one half of an hourly rate, there must be an express agreement to such an arrangement."); *Wirtz v. Harpor Buffing Mach. Co.*, 280 F. Supp. 376, 381 (D. Conn. 1968) ("The important objective is assurance that the employees and the employer are aware that overtime compensation in a specific amount is included in the contract.  Unless both sides clearly understand this to be so, it cannot be said with any certainty that the purposes of the law in requiring additional pay for overtime work are being achieved.").

The Defendants also suggest that the Court can infer the terms of this purported "express agreement" based on the fact that grooms "worked for Zito Racing for many years without ever once questioning or objecting to either their weekly salary or their workweek."  Defendants rely on the proposition that "[w]here an agreement involves repeated occasions for performance . . . any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."  *Conzo v. City of N.Y.*, 438 F. Supp. 2d. 432, 436 (S.D.N.Y. 2006).  The Court declines to draw any inference that there was an express agreement between the parties whereby the weekly salary paid included a premium for overtime based on the fact that grooms accepted their weekly checks without complaint to the Defendants.  In any event, Defendants' reliance on *Conzo* is misplaced as that case dealt with interpreting a clause in a written collective bargaining agreement.  *Conzo*, 438 F. Supp. 2d at 436.  Accordingly, the Court finds that Defendants have not rebutted the presumption that the weekly salary paid to a groom represents compensation for the first 40 hours of an employee's workweek only.

### 3.    Alleged Overtime Policies

Defendants next contend, despite previously arguing that the parties agreed to incorporate a premium in the weekly salary for hours worked in excess of 40, that any overtime that may have been worked by Plaintiffs was in violation of Zito Racing's policies and practices, and

22

therefore, did not violate the FLSA.  Defendants maintain that where an employer has a policy prohibiting overtime work and the employee deliberately prevents the employer from becoming aware of any overtime hours worked, the employer does not violate the FLSA by failing to pay for those overtime hours.  To support this proposition, Defendants cite cases outside the Second Circuit.  *See Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (concluding that where an employer has no knowledge that an employee is working overtime and the "employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employee's failure to pay for the overtime hours is not a violation of § 207") (internal quotation marks omitted); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981) ("[W]here the acts of an employee prevent an employer from acquiring knowledge, here of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work in violation of § 207(a)."); *Darrikhuma v. Southland Corp.*, 975 F. Supp. 778, 783 (D. Md. 1997) ("Plaintiff must prove that Defendant had knowledge, either actual or constructive, of his overtime work.") (internal quotation marks omitted).  However, both the Second Circuit and this District have cited *Forrester* with approval. *See Joza v. WW JFK LLC*, No. 07-CV-4153, 2010 WL 3619551, at *8 (E.D.N.Y. Sept. 10, 2010) ("Most authorities in the Second Circuit consider the Ninth Circuit's decision in *Forrester* to be seminal."); *see also Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998).

As an initial matter, the Court concludes that the record is devoid of any evidence supporting Defendants' contention that there was a policy in place prohibiting overtime. Certainly, Defendants never provided an exhibit evidencing any *written* policy.  Defendants maintain that Zito Racing's payroll practices "required" employees to inform the assistant trainers if a deviation from work hours occurred since it was known by all employees that the

23

assistant trainers prepared the weekly payroll data.  Defs.' Mem. in Opp. at 12.  In making that assertion, Defendants point to paragraphs 20 and 21 of the Poole Declaration and paragraph 10 of the Troncozo Declaration, neither of which makes such a statement.  Moreover, such a policy or practice, if it even existed, does not explicitly prohibit overtime.  In any event, the mere existence of such a policy or practice does not shield a defendant from liability.  *See* 29 C.F.R. § 785.13 ("[I]t is the duty of management to exercise its control and see that the work is not performed if it does not want it to be performed.  It cannot sit back and accept the benefits without compensating for them.  *The mere promulgation of a rule against such work is not enough*.  Management has the power to enforce the rule and must make every effort to do so.") (emphasis added).  The record here does not provide a scintilla of evidence showing that Defendants made any effort to stop employees from working overtime.  In fact, the assistant trainers were present at the barn supervising the employees on a daily basis.  Even more telling is the fact that Defendants readily admit (when it serves Defendants' interest to do so) that grooms work over 40 hours a week.  Therefore, to now claim that Defendants did not know that employees, particularly grooms, were working over 40 hours a week strains credibility.

In addition, the circumstances surrounding the present action are unlike those cases which have determined that defendants lacked the appropriate knowledge for purposes of finding liability.  While the applicable case law makes clear that "[a]n employer must have an opportunity to comply with the provisions of the FLSA," courts have warned that "[t]his is not to say that an employer may escape responsibility by negligently maintaining records required by the FLSA, or deliberately turning its back on a situation."  *Forrester*, 646 F.2d at 414.  As previously discussed, the negligent maintenance of records is precisely what this action involves.  For this reason alone, the Defendants are not in a position to now claim that they did not know or

24

should not have known the hours worked by their employees.  The circumstances peculiar to these Plaintiffs are dissimilar to those cases Defendants rely upon for other reasons as well. Those courts which have excused violations by a defendant involved situations where the plaintiffs either worked overtime hours despite being explicitly told that they were not authorized to do so or where the plaintiffs failed to record their own hours on time sheets.  *See Newton*, 47 F.3d at 749; *Forrester*, 646 F.2d at 414; *Darrikhuma*, 975 F. Supp. at 783.  Here, there is no evidence of any assistant trainer (or anyone else) expressly telling one or more of the Plaintiffs that they were not authorized to work overtime.  Likewise, prior to 2008, the Defendants never used time sheets.  In this case, the record supports the opposite conclusion, that Plaintiffs' actions did not in any way prevent Defendants from knowing the hours Plaintiffs worked, and that the Defendants knew or should have known that these hours were being worked.  As such, the Court finds Defendants' contention that any overtime worked by Plaintiffs was in violation of Zito Racing's policies and practices to be without merit.

### 4.    Spread of Hours

Plaintiffs allege that they are entitled to "spread of hours" compensation for those days where their hours increased to as much as 12 to 13 hours per day.  Under New York law, employers must pay "one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required . . . for any day in which (a) the spread of hours exceeds 10 hours; or (b) there is a split shift; or (c) both situations occur."  N.Y. Comp. Codes R. & Regs. tit. 12 § 142–2.4.  "Spread of hours" is defined as "the interval between the beginning and end of an employee's workday."  *Id.* § 142–3.16.  Defendants maintain that not only should summary judgment be denied on the "spread of hours" claim, but also that Plaintiffs' spread of hours claim should be dismissed.  The Defendants believe that dismissal is warranted on the grounds that

25

Section 142–2.4 is inapplicable to an employee who makes over the minimum wage.  Although Plaintiffs fail to address this argument in their motion papers, the Court has reviewed the applicable case law.  While Defendants correctly interpret the law in this Circuit, this Court is unable to determine, as a matter of law, based on the existing record, whether Plaintiffs are being paid at, above, or below the applicable minimum wage.  As such, Plaintiffs' motion for summary judgment on the "spread of hours" claim is denied.  For the same reason, Defendants' request to dismiss this claim is also denied.

Admittedly, the case law is not uniform on this issue.  In at least one instance, a court in this Circuit has found that Section 142–2.4 is applicable to all employees, regardless of whether they make more than the minimum wage.  *See Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 339 (S.D.N.Y. 2005).  In *Doo Nam Yang*, the court was asked to consider an opinion letter by the New York State Department of Labor which stated the following:

> [I]f the weekly wages actually paid to an employee equal or exceed the total of: (i) 40 hours paid at the basic minimum wage rate; (ii) overtime paid at the particular employee's overtime rate; and (iii) one hour's basic minimum wage rate for each day the employee worked in excess of 10 hours, then no additional compensation is due.

*Id.*  The court first concluded that deference to the opinion letter of the New York State Department of Labor was not required since the question at issue involved one of legal interpretation.  In any event, the court held that the "effect of adopting the agency's interpretation would be to carve out an exception to the spread of hours provision for workers who are properly paid overtime and make more than minimum wage."  *Id.* at 339-40.

However, just last year, this District considered the *Doo Nam Yang* case and all subsequent cases on this issue and held that:

[A] majority of the cases since *Yang* have disagreed as to both the holding that the plain language of the statute did not limit its applicability to minimum wage workers, *Chan v. Triple 8 Palace, Inc.*, No. 03-CV-6048, 2006 WL 851749, at *21 (S.D.N.Y. March 30, 2006) (holding that because section 142–2.4 explicitly provides for an additional wage only "in addition to the *minimum wage*" required under New York law, "[i]t is therefore to be expected that the provision will not affect workers whose total weekly compensation is already sufficiently above the minimum rate") (emphasis in original), and the court's decision not to grant deference to the Department of Labor opinion letter, *Seenaraine v. Securitas Security Services USA, Inc.*, 37 A.D.3d 700, 701-02, 830 N.Y.S.2d 728, 729 (2d Dep't 2007) ("[T]he Department of Labor's interpretation of the regulation is neither unreasonable nor irrational, nor is it in conflict with the plain meaning of the promulgated language.  Thus, it is entitled to deference.").[17]

*Sosnowy v. A. Perri Farms, Inc.*, 764 F. Supp. 2d 457, 474 (E.D.N.Y. 2011); *see also Li Ping Fu v. Pop Art Intern. Inc.*, No. 10 Civ. 8562, 2011 WL 4552436, at *6 (S.D.N.Y. Sept. 19, 2011) ("Most courts in this Circuit have ruled that New York's spread of hours provision applies only to employees earning minimum wage.").  In light of its own reading of Section 142–2.4, the court in *Sosnowy* agreed with the cases finding that "the explicit reference to the 'minimum wage' in section 142–2.4 indicates that 'the spread-of-hours provision is properly limited to enhancing the compensation of those receiving only the minimum required by law.'"  *Sosnowy*, 764 F. Supp. 2d at 474 (quoting *Almeida v. Aguinaga*, 500 F. Supp. 2d 366, 370 (S.D.N.Y. 2007)).

---

17      In *Sosnowy*, Judge Spatt also cited many of the cases relied on by the Defendants for the proposition that Section 142–2.4 is inapplicable to an employee who makes over the minimum wage.  *See Almeida v. Aguinaga*, 500 F. Supp. 2d 366, 370 (S.D.N.Y. 2007); *Espinosa v. Delgado Travel Agency*, No. 05-CV-6917, 2007 WL 656271, at *1-2 (S.D.N.Y. Mar. 2, 2007); *Franklin v. Breton In'l, Inc.*, No. 06-CV-4877, 2006 WL 3591949, at *4 (S.D.N.Y. Dec. 11, 2006).

While Plaintiffs have submitted some evidence to support their argument that certain employees worked over 10 hours a day during the race season, there are no specific allegations in the Third Amended Complaint that Plaintiffs were paid at or below minimum wage. Moreover, this fact cannot be ascertained from the present record. While the Court has determined, as a matter of law, that grooms work over 40 hours a week, the precise number of hours grooms work is still an open issue for the jury. The Court has also found that a question of fact exists whether hot walkers work over 40 hours in a given week. Because the number of hours worked is a necessary component in determining whether a weekly salary is at or above the minimum wage threshold, summary judgment on this claim must be denied.

### 5.   Summary of Rulings

The Court concludes that only those employees serving as grooms for Zito Racing are entitled to partial summary judgment on the issue of Defendants' failure to properly compensate grooms for overtime hours worked, in violation of the FLSA and New York Labor Law. *See Estrella v. P.R. Painting*, 356 Fed. Appx. 495, 497 (2d Cir. 2009) (concluding that employer's failure to compensate employee for even one hour of overtime establishes liability and "[a]nything else relates only to damages"). Pursuant to the FLSA claim, partial summary judgment is granted in favor of Plaintiffs Berrios, Chavez, Eleazar Hernandez and Luis Hernandez. For purposes of the New York Labor Law claim, partial summary judgment is granted in favor of the sub-class of grooms. The amount of damages to be awarded to these Plaintiffs will be determined at trial. Partial summary judgment is not warranted as to claims brought by hot walkers as well as Plaintiffs' "spread of hours" claim.

28

### B.      Defendants' Motion for Summary Judgment

In addition to moving to dismiss all claims brought by hot walkers or exercise riders for alleged unpaid overtime wages, Defendants also seek to (1) dismiss certain FLSA claims as time-barred due to the lack of willful violations; (2) dismiss all claims against Nick Zito individually; and (3) limit the relief potentially available to Plaintiffs as one-half the regular rate of pay for each affected employee.  Each of these arguments will be addressed separately.

### 1.      Willfulness

The statute of limitations for an action under the FLSA is two years from the date the cause of action accrues, unless the FLSA violation was willful, in which case a three-year statute of limitation applies.[18]  29 U.S.C. § 255(a).  "An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act.'"  *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1667, 100 L. Ed. 2d 115 (1988)).  Mere negligence on the part of the employer will not suffice.  *See McLaughlin*, 486 U.S. at 133; *Howard v. Port Auth. of N.Y.*, 684 F. Supp. 2d 409, 415 (S.D.N.Y. 2010).  The burden of proving willfulness lies with the employee.  *Young*, 586 F.3d at 207.

 Courts within this Circuit have left the question of willfulness to the trier of fact.  *See Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 268 (E.D.N.Y. 2008) (citing cases).  In those instances where courts have found a lack of willfulness at the summary judgment stage, the FLSA violation was due to a missclassification of the plaintiff as being exempt.  *See, e.g., Howard*, 684 F. Supp. 2d at 416 (classifying helicopter pilots as non-exempt did not evidence willfulness on

---

18      The Court notes that the limitations period for violations of New York State's overtime law is six years.  *See* N.Y. Lab. L. §§ 198(3), 663(3).  Therefore, Defendants' motion does not have any effect on the state claims.

the part of the defendant); *Clarke v. JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400, 2010 WL 1379778, at *12 (S.D.N.Y. Mar. 26, 2010) (finding no willful violation where defendants originally classified plaintiff as ineligible for overtime).  In this case, Defendants do not argue that Plaintiffs were exempt under the FLSA.  Instead, Defendants contend that the Plaintiffs cannot sustain their burden of proving that Defendants knowingly or recklessly violated the FLSA.  While the Court is not persuaded by some of the arguments articulated in Plaintiffs' opposition papers, based on the record presented here, a reasonable jury could conclude that violations of the FLSA by Zito Racing were willful.

It is undisputed that Zito Racing failed to keep track of the hours worked by its employees prior to September 2008.  The Court also notes that the submitted payroll records for the Plaintiffs contain a column labeled "OT."  While it is clear that this "OT" figure was computed without any regard to hours worked, this notation, coupled with the failure to track employee hours, could support an argument that Defendants willfully violated the overtime provisions of the FLSA.  Further support for a potential finding of willfulness can be found in the deposition testimony of Adriana Cergioli who testified that she complained to the foreman and assistant trainer on more than one occasion about not being properly compensated.  *See* Cergioli Dep. at 47:12-18, 48:23-49:22.  Although Defendants claim that a complaint was never made, such a factual dispute means that the issue of willfulness must proceed to a jury.  *See Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276, 294 (E.D.N.Y. 2007)  (denying summary judgment as to willfulness where plaintiffs adduced evidence that they complained about their wages).  Without passing judgment on Plaintiffs' contention that Defendants showed reckless disregard for compliance with the wage statutes when Zito Racing hired James Hilt as its bookkeeper without first investigating his alleged lack of credentials, "[e]mployers maybe

30

found to have acted recklessly pursuant to the FLSA if they made neither a diligent review nor consulted with counsel regarding their overtime practices." *Difilippo v. Barclays Capital, Inc.*, 552 F. Supp. 2d 417, 425 (S.D.N.Y. 2008).  In this case, there is no evidence that Defendants ever undertook a review of their practices or consulted with an attorney regarding such practices.

Zito Racing maintains that it had never been informed that its pay practices violated any law.  However, this passive/reactive approach will not preclude a plaintiff from seeking a three-year statute of limitations pursuant to a defendant's alleged willfulness.  Likewise, Defendants' contention that their payroll practices were consistent with the industry norm does not foreclose this avenue for Plaintiffs either.  These and other arguments raised by Defendants do nothing more than create a genuine issue of material fact whether Zito Racing acted willfully in failing to appropriately compensate employees for overtime.  Since a reasonable jury could conclude from the record that Defendants knew or showed reckless disregard for whether its conduct was prohibited by the FLSA, the applicable statute of limitations may extend to three years.  As such, the Court denies Defendants' motion for summary judgment seeking to bar those claims that accrued more than two years from the date the respective Plaintiffs filed written consent forms with the Court.

### 2.      Individual Liability

Defendants next contend that Nick Zito should be dismissed as a party from this action. Defendants argue that Plaintiffs have failed to generate any evidence that Zito was an "employer" within the meaning of the FLSA.  The Court disagrees.

An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  Like all other provisions under the

FLSA, the definition of employer has been defined broadly.[19]  *Falk v. Brennan*, 414 U.S. 190, 195, 94 S. Ct. 427, 38 L. Ed. 2d 406 (1973); *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).  The overarching concern in determining whether an individual is an employer is whether he or she "possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case."  *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  Therefore, to answer this question, courts apply the "economic reality" test, which considers whether the alleged employer: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (internal quotation marks omitted).  This non-exclusive four factor "economic reality" test is based upon the totality of the circumstances, with no one factor being dispositive. *Id*.  The question of whether a defendant is an employer under the FLSA is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations.  *See Franco v. Ideal Morg. Bankers Ltd.*, No. 07-CV-3956, 2011 WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 190 (S.D.N.Y. 2003).  Therefore, individual employer liability is rarely suitable for summary judgment.  *Franco*, 2011 WL 317971, at *6.

---

19      The definition of employer is equally expansive under New York Law and the economic reality test is used to determine whether an individual is an employer under both federal and state law.  *See Jiao*, 2007 WL 4944767, at *9 n.12; *Chung v. New Silver Palace Rests., Inc.*, 272 F. Supp. 2d 314, 318 n.6 (S.D.N.Y. 2003).

Contrary to the Defendants' claim, the record developed in discovery provides some support for three of the factors.[20]  For instance, while Zito testified that most of the personnel decisions were made through his assistant trainers, he was the one in charge of hiring and firing the assistant trainers.  Zito Dep. at 34:14-35:2.  The fact that Zito delegated to his assistants the responsibility of hiring and firing lower level employees did not in any way relinquish his authority to hire or fire those employees.  *See Herman*, 172 F.3d at 140 (determining that "although [appellant's] hiring involved mainly managerial staff, the fact that he hired individuals who were in charge of the guards is a strong indication of control"); *Franco*, 2011 WL 317971, at *6 (concluding that the record strongly suggests that the president and majority owner of the defendant entity had the power to hire and fire as he not only oversaw the entire operation, but "he directly supervised Denise Tyler, who hired the loan officers").

As to the second factor, assistant trainer Troncozo testified that Zito called him multiple times each day and spent one day each week at the stables to check on his business.  Troncozo Dep. at 61:21-24.  This testimony suggests that Zito, on occasion, supervised and controlled employee work schedules and the conditions of employment.  *See Herman*, 172 F.3d at 139 ("Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA.").  As for payment determinations, Zito testified that his assistant trainers and foremen exercised this responsibility.  However, it would certainly be reasonable for a jury to conclude that Zito, as president and majority owner, influenced these decisions.  *See Franco*, 2011 WL 317971, at *7.  In fact, Zito confirmed that in most instances,

---

20      While there is no evidence to support the fourth factor – Zito's involvement in maintaining employment records (albeit inadequate records) –  such a failure is not dispositive. *Herman*, 172 F.3d at 140.

these determinations were done with his knowledge and approval.  Zito Dep. at 114:16-115:3.
Zito also testified that the ultimate decision on giving raises was his.  Zito Dep. at 35:20-22.

Equally important is the fact that a reasonable jury could also conclude that Zito had
"operational control" over Zito Racing.  In cases where a corporation is the worker's direct
employer, individual officers or directors may also be "deemed employers under the FLSA
where the individual has overall operational control of the corporation, possesses an ownership
interest in it, controls significant functions of the business, or determines the employees' salaries
and makes hiring decisions."  *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184,
192 (S.D.N.Y. 2003) (quoting *Lopez v. Silverman*, 14 F. Supp. 2d 405, 412 (S.D.N.Y. 1998));
*see also Tracy v. NVR, Inc.*, 667 F. Supp. 2d 244, 246 (W.D.N.Y. 2009) (listing "operational
control" factors).

It is undisputed that Zito was not only the president of Zito Racing but was also the sole
shareholder.  Evidence of Zito's overall operational control can also be gleaned from:  his own
testimony regarding his power to hire and fire assistant trainers; Hilt's testimony regarding
Zito's approval for every check cut; and Troncozo's testimony regarding his daily interaction
with Zito regarding the business.  *See* Zito Dep. at 34:16-18; Hilt Dep. at 37:9-38:2; Troncozo
Dep. at 61:21-24; *see also Ansoumana*, 255 F. Supp. 2d at 193 (finding the two owners/sole
shareholders personally liable where "together they personally oversee and operate the
companies and their agents on a daily basis.").

Looking at the totality of the circumstances and the broad scope in which the FLSA is to
be analyzed, it is the Court's view that a reasonable jury could find that Zito was an "employer"
under the FLSA.  Accordingly, Defendants' motion seeking to dismiss Zito from this action is
denied.

34

### 3.      Proper Measure of Damages

Lastly, Defendants contend that the measure of pay for hours worked in excess of 40 hours can be determined, as a matter of law, as one-half of the grooms' regular hourly rate. This contention is premised on an alleged employment agreement where the weekly salary paid to each employee covered all hours worked each week.

As previously discussed, the FLSA requires that employees be compensated at one and one-half times the regular rate at which they are employed for hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). However, under certain circumstances, courts have determined that the appropriate damages for unpaid overtime are one-half the "regular rate" paid to the employee. For instance, in *Overnight Motor*, a decision heavily relied upon by the Defendants, the Supreme Court was faced with determining what the "regular rate" of pay was in a case involving an employee who was paid a fixed weekly wage without regard to the hours worked, pursuant to an employment contract. 316 U.S. at 579-80. The Supreme Court first concluded that "[w]here the employment contract is for a weekly wage with variable or fluctuating hours," the "regular rate" was determined the same way it would be for an employee under contract for a fixed weekly wage for regular contract hours, by dividing the fixed weekly wage by the total number of hours worked each week. *Id.* at 580. However, since the parties contracted that the weekly wage was to cover all hours worked, the court in *Overnight Motor* further determined that the employee was only entitled to an overtime premium of one-half the regular rate. *Id.*

For purposes of this motion, the Court need not extend the analysis beyond this point. Based on the record here, the Court is not in a position to conclude, as a matter of law, that there was any type of agreement between the parties whereby the weekly salary paid to each employee

35

was intended to cover all hours worked each week.  As previously discussed, the Plaintiff grooms deny that they entered into any sort of employment agreement.  Defendants' own bookkeeper also testified that no special verbalized employment agreement existed between the parties.  While the Court has concluded that the Defendants' evidence did not rebut the presumption that a weekly salary represents compensation for the first 40 hours of an employee's workweek, such evidence in the present situation creates, at most, a question of fact rendering summary judgment inappropriate.  As such, the Court declines to limit potential damages for overtime violations to one-half the regular hourly rate at this time.

## V.    CONCLUSION

For the reasons discussed above, Plaintiffs' motion for partial summary judgment is GRANTED, in part.  Defendants' motion for partial summary judgment is DENIED, with the exception of those claims brought on behalf of exercise riders pursuant to the New York Labor Law class action.  Those claims are dismissed.  The parties are directed to participate in a telephone conference on May 1, 2012, at 10:00 a.m.  Plaintiffs' counsel is directed to initiate the call to Chambers.

**SO ORDERED.**

Dated: Central Islip, New York
       March 28, 2012

                              /s/ A. Kathleen Tomlinson
                              A. KATHLEEN TOMLINSON
                              U.S. Magistrate Judge